UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSE PELLOT<br><br>*Plaintiff*,<br><br>v.<br><br>GGB LLC<br><br>*Defendant*. | Case No. 1:21-cv-10828-JHR-SAK<br><br>**Opinion** |

This matter comes before the Court on Plaintiff Jose Pellot's ("Plaintiff") Motion to Remand [Dkt. 18] and Defendant GGB LLC's ("Defendant") opposition thereto [Dkt. 22]. After reviewing the parties' submissions, and for the reasons discussed below, the Court will grant Plaintiff's motion.

**I.    Factual and Procedural Background**

The facts of this case are straightforward. Plaintiff was an employee of Defendant. [Dkt. 10, Am. Compl. ¶ 4]. Plaintiff was also a union member of Local No. 81134 of the Industrial Division of the Communication Workers of America AFL-CIO, with which Defendant had a collective bargaining agreement ("the CBA"). While neither party provided a complete copy of the CBA, the excerpts provided contain several provisions relevant to the present issue. Article 13 of the CBA is titled "Disciplinary Action" which sets forth a just-cause termination requirement, as well as disciplinary notice and hearing obligations. [Dkt. 1-2 at 14]. Appended to the CBA is a three-page document titled "Expected Conduct for All GGB Employees" (the "Expected Conduct Policy"). [Dkt. 1-2 at 15]. The Expected Conduct Policy states that it was

1

"issued solely at the discretion of the company and [is] not the result of the collective bargaining process." [Dkt 1-2 at 15]. One example of "expected conduct" requires employees to "Build and Maintain a Safe and Health Environment for Our employees, Customers, Suppliers, and Local Communities." [Dkt. 1-2 at 16]. A footnote to the Expected Conduct Policy states that "[n]ormally, company rule violations will result in progressive discipline, i.e. written warning, suspension, and termination. However, mitigating or aggravating circumstances will be taken into consideration and may result in more or less severe corrective actions being administered." [Dkt. 1-2 at 17].

On April 7, 2019 Plaintiff was suspended from work for three days for putting "a piece of wood under a foot pedal," which Defendant deemed a safety hazard. [Am. Compl. ¶¶ 14–18]. In connection with this incident, Plaintiff signed a "Last Chance Memorandum" on April 11, 2019 which stated, in part, that Plaintiff

> must adhere to the following terms and conditions:
>
> …
>
> B) Any future safety-related performance problems caused by my violation of this memorandum shall be grounds for immediate termination from the Company's employment.
>
> C) The Union (if applicable) and I waive any right to challenge any termination pursuant to paragraphs (a) or (b) through any court, arbitration, or other form of proceeding.

[Am. Compl. ¶ 20]. Though he signed this Last Chance Memorandum, Plaintiff maintains that he did not "agree on [its] essential terms," and "there was no common understanding nor mutual assent to all the terms." [*See* Am. Compl. ¶¶ 20–30]. A union representative also signed this memorandum. [*See* Dkt. 1-2 at 19].

Effective May 22, 2019, Defendant issued a revised "Zero Tolerance" policy (the "Zero Tolerance Policy") which stated, among other things, that "SAFETY GLASSES … [m]ust be worn at all times in all areas on the plant floor…." [Am. Compl. ¶ 32]. This policy also included a section titled "**DISCIPLINE ACTION**" which stated that "[i]f an employee is not following any of the above [safety precautions], the employee will be escorted out of the building with no pay for the day. When the employee returns, management will meet with the employee and review the corrective action." [Dkt. 1-2 at 23].

On January 7, 2020, Plaintiff was sent home from work after a supervisor observed Plaintiff on the plant floor without safety goggles. [Am. Compl. ¶¶ 39–43].[1] Defendant later found that Plaintiff violated the Expected Conduct Policy provision addressing a "safe work environment" and the Zero Tolerance Policy. [Am. Compl. ¶ 42; Dkt. 1-2 at 25]. In light of the April 11, 2019 Last Chance Memorandum, Defendant terminated Plaintiff on January 8, 2020. [Am. Compl. ¶ 48].[2]

Plaintiff filed his initial complaint in the Superior Court of New Jersey, Camden County, General Equity on April 8, 2021 alleging, among other things, that Defendant violated the CBA by discharging Plaintiff without just cause. [*See* Dkt. 1-2 at 9]. The case was transferred *sua sponte* to Burlington County. [*See* Dkt. 1 at 1; Dkt. 22 at 8]. Defendant removed the case to this Court on the basis of federal question jurisdiction under 28 U.S.C. § 1331, alleging that the Labor Relations Management Act ("LMRA") preempts Plaintiff's claims and that federal law

---

[1] Plaintiff does not deny that he was on the plant floor without safety goggles.

[2] Though not identified in the Amended Complaint, the Corrective Action Memo documenting the January 7, 2000 incident also demonstrates that Plaintiff had previously received two written warnings in 2018. [Dkt. 1-2 at 26].

governs the action. [Dkt.1 at 2]. Defendant also moved to dismiss the original complaint. [Dkt. 6].

Plaintiff then filed the Amended Complaint, which is now the operative complaint. [Dkt. 10]. The Amended Complaint alleges that Defendant "breached a contract it had with Plaintiff – [the Expected Conduct Policy]" by failing to provide progressive discipline as the Expected Conduct Policy requires. [Am. Compl. ¶ 56]. For relief, Plaintiff seeks a judgment that the Expected Conduct Policy created a legally enforceable contract between Plaintiff and GGB, judgment that the Last Chance Memorandum is unenforceable, a declaration that Plaintiff's discharge "was not an appropriate corrective measure," a declaration that Defendant breached the Expected Conduct Policy because his termination "was not an appropriate corrective measure," an order reinstating Plaintiff into his job, and any other equitable relief "which the Court may deem just." [Am. Compl. ¶ 57].

After filing the Amended Complaint, Plaintiff filed the present motion for remand. [Dkt. 18-2]. In essence, Plaintiff argues that the Court lacks jurisdiction over this case because Plaintiff no longer alleges that Defendants breached the CBA by terminating Plaintiff, but alleges instead that Defendants breached the Expected Conduct Policy, which is a purely state-law claim.

II. **Legal Analysis**

Although federal courts have limited jurisdiction, 28 U.S.C. § 1331 vests federal district courts with original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." Under the federal removal statute, 28 U.S.C. § 1441(a), "a defendant may remove a civil action from state court to the district court when the district court has original jurisdiction over the civil action and the district court geographically encompasses

the state court where the action was originally filed." *Manos v. United Food & Com. Workers Int'l Union*, 9 F. Supp. 3d 473, 478 (D.N.J. 2014).

"[T]he presence of federal question jurisdiction is governed by reference to the "well-pleaded complaint" doctrine. *Dawson ex rel. Thompson v. Ciba-Geigy Corp.*, USA, 145 F. Supp. 2d 565, 568 (D.N.J. 2001) (citing *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 808, 106 S. Ct. 3229, 92 L. Ed. 2d 650 (1986)). Under this rule, a plaintiff is the "master of the complaint," and a case filed in state court may be removed only if a federal claim exists on the face of a plaintiff's complaint. *Id.* (citing *Merrell Dow Pharmaceuticals, Inc.*, 478 U.S. at 808); *Hall v. Keyes*, No. 1:21-CV-04748, 2021 WL 2660296, at *2 (D.N.J. June 29, 2021) (citations omitted).

Under the well-pleaded complaint rule, defenses grounded in federal law generally do not establish federal question jurisdiction, even if federal law preempts a state-law claim. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392–93, 107 S. Ct. 2425, 2430, 96 L. Ed. 2d 318 (1987). However, "a corollary" rule known as the "complete preemption doctrine" applies where "the pre-emptive force of a [federal] statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Id.* at 393 (quoting *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 65, 107 S. Ct. 1542, 1547, 95 L.Ed.2d 55 (1987)). "Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Id.* (citing *Franchise Tax Board of Cal. v. Construction Laborers Vacation Trust for Southern Cal.*, 463 U.S. 1, 24, 103 S. Ct. 2841, 2854, 77 L.Ed.2d 420 (1983)).

5

"Section 301(a) of the LMRA, 29 U.S.C. § 185(a), is one such statute that imposes the doctrine of complete preemption." *Manos*, 9 F. Supp. at 479 (citing *Caterpillar*, 482 U.S. at 393, 107 S. Ct. at 2425). Section 301 provides that

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect of the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). Section 301 "mandate[s] resort to federal rules of law in order to ensure uniform interpretation of collective-bargaining agreements, and thus to promote the peaceable, consistent resolution of labor-management disputes." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 404, 108 S. Ct. 1877, 1880, 100 L. Ed. 2d 410 (1988).

Despite its "extraordinary preemptive force," the LMRA does not necessarily preempt all state law claims brought by union employees against their employers. "Section 301 governs claims founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on analysis of a collective-bargaining agreement." *Caterpillar*, 482 U.S. at 394, 107 S. Ct. at 2431 (citations and quotations omitted). In other words, "questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law…." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211, 105 S. Ct. 1904, 1911, 85 L. Ed. 2d 206 (1985). But the "existence of a [collective bargaining agreement] does not, in itself, prevent an individual from asserting state-law claims based on an agreement or obligations independent of the CBA." *Snyder v. Dietz & Watson, Inc.*, 837 F. Supp. 2d 428, 438 (D.N.J. 2011). Thus, "[c]laims that are independent of a collective bargaining agreement, even if they are between

6

employees and employers" are not preempted by the LMRA and "are not removable." *Antol v. Esposto*, 100 F.3d 1111, 1117 (3d Cir. 1996), *amended*, (3d Cir. Jan. 20, 1997).

Plaintiff's Amended Complaint alleges that Defendant breached the Expected Conduct Policy, which established a contract between Plaintiff and Defendant and which "plainly disavows any connection to the collective bargaining process." [Dkt. 18-2 at 6]. Plaintiff argues that the LMRA does not preempt his breach of contract claim because he has alleged breach of a contract with no connection to the CBA, and that his case should be remanded to state court for lack of federal jurisdiction. [*Id.*].

Defendant argues that the CBA preempts Plaintiff's breach of contract claim because the Complaint alleges that Defendant breached the CBA. [Dkt. 22 at 10]. Defendant points out that the Expected Conduct Policy is included in the CBA and the Amended Complaint expressly refers to the CBA when citing to the Expected Conduct Policy. [Dkt. 22 at 10]. Defendant also argues that an analysis of the Expected Conduct Policy is "substantially dependent upon analysis" of the CBA's terms. [Dkt. 22 at 11].

Defendant is correct that if Plaintiff's "breach of contract claim alleges a violation of a provision in the CBA" or is substantially dependent on an analysis of the CBA, the claim must be brought under § 301." *Snyder v. Dietz & Watson, Inc.*, 837 F. Supp. 2d 428, 441 (D.N.J. 2011). While Plaintiff's first complaint alleged a breach of the CBA, the Amended Complaint only alleges breach of the Expected Conduct Policy, which states that it is "issued solely at the discretion of the company and [is] not the result of the collective bargaining process" [Dkt. 22-4 at 6], even though it is appended to the CBA. This distinction matters.

The Supreme Court case *Caterpillar Inc. v. Williams* illustrates the significance of Plaintiff's revised pleading. There, the Supreme Court held that federal courts could not exercise

7

jurisdiction over the plaintiffs' breach of contract claim for improper termination even though a CBA existed. *Caterpillar*, 482 U.S. at 399, 107 S. Ct. at 2433. The employee plaintiffs in *Caterpillar* "possessed substantial rights under [a] collective agreement, and could have brought suit under § 301," but instead alleged breach of contract based on "oral and written representations that they could look forward to indefinite and lasting employment with the corporation…." *Id.* at 388, 395, 107 S. Ct. at 2427, 2431. Despite the CBA, the Supreme Court found that the LMRA did not preempt the plaintiffs' breach of contract claims. The Court emphasized that "a plaintiff covered by a collective-bargaining agreement is permitted to assert legal rights independent of that agreement, including state-law contract rights, so long as the contract relied upon is not a collective-bargaining agreement." *Id.* at 396, 107 S. Ct. at 2431.

Following *Caterpillar*, Courts nationwide have taken differing approaches and reached divergent conclusions when considering—in cases roughly analogous to this one—whether the LMRA preempts breach of employment contract claims based on employee handbooks, workplace policies, and other employer communications. In cases finding preemption, courts have focused on the nature of the underlying lawsuit—redress for termination of the plaintiff's employment—and grievance procedures in the CBAs at issue. These courts found federal preemption because the CBAs outlined procedures for addressing employee termination, and the CBA would ultimately control plaintiff's improper discharge claim even though the plaintiffs alleged breach of a different contract. *See, e.g.*, *Civardi v. Gen. Dynamics Corp.*, 603 F. Supp. 2d 393, 398 (D. Conn. 2009) (finding that the plaintiff's breach of employee handbook claim was preempted because it "cannot be resolved without interpretation of the CBA" that contained grievance procedures for improper terminations); *Henderson v. Merck & Co.*, 998 F. Supp. 532, 538–39 (E.D. Pa. 1998) (finding that plaintiff's breach of contract claim based on employment

8

manual "is a sub-issue of the larger inquiry: whether plaintiff's contractual rights were violated by the circumstances of his discharge," and that resolution of this larger issue required interpretation of the collective bargaining agreement).

The problem, however, is that the *Caterpillar* Court rejected this approach of using CBA grievance procedures to justify federal preemption.[3] Indeed, it is premature to find on a motion for remand that a CBA will eventually and ultimately govern a complaint predicated on breach of a non-CBA contract. *See Caterpillar*, 482 U.S. at 399 ("The fact that a defendant might ultimately prove that a plaintiff's claims are pre-empted under the NLRA does not establish that they are removable to federal court."). Moreover, "[t]he fact that a collective bargaining agreement [is] part of the **context** in which an employee's claim must be addressed [does] not trigger complete preemption **in the absence of some substantial dispute over the meaning of the collective bargaining agreement**." *Kline v. Sec. Guards, Inc.*, 386 F.3d 246, 257 (3d Cir. 2004) (emphasis added).

By contrast, courts that have refused to find preemption properly focused on the source of the rights which the plaintiffs allege have been violated. For example, in *Jordan v. Equity Group Eufaula Division, LLC*, the plaintiff alleged a breach of contract and wrongful discharge claim based in part on employee handbook provisions and not on the collective bargaining agreement. No. 208-CV-152-MEF WO, 2008 WL 4671781, at *4 (M.D. Ala. Oct. 21, 2008). The court found that "preemption is appropriate when an employee alleges a violation of a labor

---

[3] *Caterpillar*, 482 U.S. at 399, 107 S. Ct. at 2432 ("Caterpillar contends that the Court of Appeals' decision offends the paramount national labor policy of referring disputes to arbitration, since its collective-bargaining agreement with the Union contains an arbitration cause. This argument presumes that respondents' claims are arbitrable, when, in fact, they are alleged to grow out of individual employment contracts to which the grievance-arbitration procedures in the collective-bargaining agreement have no application.").

contract.… However, Plaintiff does not allege breach of a labor contract or the CBA. Therefore, the Court is unwilling to covert Plaintiff's state law tort claim into a federal contract question." *Id.* (citations omitted). *See also Bowler v. Alliedbarton Sec. Servs., LLC*, 123 F. Supp. 3d 1152, 1157 (E.D. Mo. 2015) ("To the extent Plaintiffs rely on Defendant's employee handbook as creating the contractual rights they claim … the Supreme Court holds that the exception to the well-pleaded complaint rule does not apply to breaches of individual employment contracts."); *Grimm v. U.S. W. Commc'ns, Inc.*, No. CIV.4-99-CV-70637, 2000 WL 35742427, at *2 (S.D. Iowa Jan. 5, 2000) ("Grimm relies solely on the handbook as the source of her protection against sexual orientation discrimination, and the handbook does not require interpretation of the CBA to determine its relevant provisions.").

One distinction remains between these employee handbook cases and the present case. Here, the Expected Conduct Policy—unlike the employee handbooks discussed above—is physically located within the CBA. But the Expected Conduct Policy facially states that it was "issued solely at the discretion of the company and [is] not the result of the collective bargaining process." [Dkt 1-2 at 15]. In other words, the Expected Conduct Policy was not among the "terms and conditions of employment to which" Defendant and Local No. 81134 of the Industrial Division of the Communication Workers of America AFL-CIO "have given their mutual assent." 20 Williston on Contracts § 55:1 (4th ed.). *See also Allis-Chalmers Corp*, 471 U.S. at 211, 105 S. Ct. at 1911 (noting that preemption applies to claims predicated on terms to which "the parties to a labor agreement agreed"). The Expected Conduct Policy also does not refer to the grievance procedures which the CBA outlines, and the CBA does not explicitly refer to the Expected Conduct Policy. *Cf. Robinson v. Medevac Midamerica, Inc.*, No. 06-4042-SAC, 2006 WL 2726794, at *5 (D. Kan. Sept. 22, 2006) (finding employee handbook was intertwined

with the CBA because it expressly referred to the CBA and the complaint referred to the progressive discipline policy contained in the CBA). Thus, like the employee handbooks discussed above, the Expected Conduct Policy facially creates a set of rights and obligations distinct from the CBA. The fact that an individual with a physical copy of the CBA would have to flip through the CBA to view the Expected Conduct Policy does not change this conclusion. *See Livadas v. Bradshaw*, 512 U.S. 107, 108, 114 S. Ct. 2068, 2070, 129 L. Ed. 2d 93 (1994) ("[W]hen liability is governed by independent state law … the bare fact that a collective-bargaining agreement is consulted … is no reason to extinguish the state-law claim.").

At bottom, Plaintiff has "not alleged a violation of any term or condition of the CBA." *Kline*, 386 F.3d at 256. While Plaintiff could have availed himself of the rights and protections which the CBA affords to him, he chose not to. By relying exclusively on Expected Conduct Policy, Plaintiff has alleged breach of contractual rights that do not emanate "directly" from the CBA. *Caterpillar*, 482 U.S. at 394, 107 S. Ct. at 2431. As such, his state law breach of contract claim can, on its face, "be resolved without interpreting the [CBA] itself." *Lingle*, 486 U.S. at 409–10, 108 S. Ct. at 1883.

Of course, further litigation may demonstrate that the CBA preempts Plaintiff's claim. But "[t]he fact that a defendant might ultimately prove that a plaintiff's claims are pre-empted under the NLRA does not establish that they are removable to federal court." *Caterpillar*, 482 U.S. at 398, 107 S. Ct. at 24232. Because preemption provided the sole basis for federal jurisdiction in this case, and because Plaintiff has raised a state law claim that is facially not preempted, the Court lacks jurisdiction and must remand this case to state court.[4]

---

[4] The Court understands that the Expected Conduct Policy's attachment to the CBA has further complicated an already complex question of federal preemption. In close cases such as this, "all doubts should be resolved in favor of remand" because federal "removal statutes 'are to be

11

### III.    Conclusion

For the reasons discussed above, the Court will grant Plaintiff's motion.  An order remanding the case to the Burlington County Superior Court will follow.


July 30, 2021                                                                 /s/ Joseph H. Rodriguez

                                                                            Hon. Joseph H. Rodriguez, U.S.D.J.

---

strictly construed against removal.'"  *Boyer v. Snap-on Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990) (quoting *Steel Valley Auth. v. Union Switch and Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987)).  Thus, to the extent there is any doubt about whether remand is appropriate here, strict application of the federal removal statutes coupled with the "paramount policies embodied in the well-pleaded complaint rule" still favor remand.  *Caterpillar*, 482 U.S. at 398, 107 S. Ct. at 2433.